**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **Z.W., a minor by and through her Guardian ad Litem, CHEVELL CALDWELL,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MICHAEL J. ASTRUE, Commissioner of Social Security,**<br><br>**Defendant.** | **NO. EDCV 09-0322-CT**<br><br>**OPINION AND ORDER** |

For the reasons set forth below, it is ordered that judgment be entered in favor of defendant Commissioner of Social Security ("the Commissioner") because the Commissioner's decision is supported by substantial evidence and is free from material legal error.

**SUMMARY OF PROCEEDINGS**

On February 13, 2009, acting as guardian ad litem for her niece (and now adopted daughter), Z.W., Chevell Caldwell[1] filed a complaint

[1] Except when it would be inaccurate or confusing to do so, the court will refer to Caldwell and Z.W. jointly as "plaintiff."

seeking judicial review of the Commissioner's denial benefits pursuant to the Social Security Act ("the Act"). On July 3, 2009, plaintiff filed a brief in support of remand. On August 14, 2009, the Commissioner filed a brief in opposition. On August 24, 2009, plaintiff filed a reply.

**SUMMARY OF ADMINISTRATIVE RECORD**

**1. Relevant Proceedings**

On April 12, 2005, plaintiff filed an application for Supplemental Security Income ("SSI"), (TR 102-05),[2] alleging that Z.W. had been disabled since December 1, 2003, (when she was approximately two-and-a-half years old) and citing concerns with Z.W.'s physical abilities, and her abilities to communicate, understand, and behave appropriately. (See TR 118-25.) The application was denied initially and upon reconsideration. (TR 91-95, 98-101).

On March 17, 2006, plaintiff filed a request for a hearing before an administrative law judge ("ALJ"). (TR 89.) On April 16, 2008, plaintiff appeared and briefly testified at an initial administrative hearing ("the initial hearing") before an ALJ. Ms. Caldwell testified, as well, as did another of Z.W.'s aunts. The ALJ also considered the testimony of a medical expert in pediatric medicine (the "ME"). (See TR 294-318).

Because plaintiff's attorney was not present at the initial hearing, a supplemental hearing was held on June 10, 2008. (TR 319-52.) At the supplemental hearing, Z.W. and Ms. Caldwell, now accompanied by

---

[2] "TR" refers to the transcript of the record of administrative proceedings in this case and will be followed by the relevant page number(s) of the transcript.

plaintiff's attorney, appeared and testified. The ALJ also considered supplemental testimony by the ME and the testimony of a psychological medical expert ("PME").

Although the ALJ found that plaintiff is severely impaired, on July 16, 2008, the ALJ issued a decision that Z.W. was not currently disabled as defined by the Act, and thus not eligible for benefits. (TR 16-28.) On August 22, 2008, plaintiff filed a request with the Social Security Appeals Council to review the ALJ's decision. (TR 11.) On January 13, 2009, the request was denied. (TR 5-7.) Accordingly, the ALJ's decision stands as the final decision of the Commissioner.

Plaintiff subsequently sought judicial review in this court.

**2. Summary Of The Evidence**

The ALJ's decision is attached as an exhibit to this opinion and order and materially summarizes the evidence in the case.

**PLAINTIFF'S CONTENTIONS**

Plaintiff contends the Commissioner erred as a matter of law by:

1. Failing to properly consider lay testimony;
2. Substituting his own opinion for that of a medical expert; and,
3. Failing to find she was presumptively disabled because of functional equivalence to the Commissioner's listing for attention deficit hyperactivity disorder ("ADHD"), listing 112.11.

**STANDARD OF REVIEW**

Under 42 U.S.C. §405 (g), this court reviews the Commissioner's decision to determine if: (1) the Commissioner's findings are supported by substantial evidence; and, (2) the Commissioner used proper legal standards. Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996). Substantial evidence means "more than a mere scintilla," Richardson v.

Perales, 402 U.S. 389, 401 (1971), but less than a preponderance. Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

When the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, however, the Court may not substitute its judgment for that of the Commissioner. Flaten v. Sec'y of Health and Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995).

The court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. §405 (g).

**DISCUSSION**

**1. Disability Determination for Children**

A person is "disabled" for the purpose of receiving social security benefits if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d) (1) (A).

In cases involving children, if the ALJ concludes the plaintiff's impairment is "severe" within the meaning of the Act, then the ALJ must determine whether the plaintiff's impairments meet, or medically or functionally equal a listed impairment in Appendix 1 of subpart P, part 404 of the Code of Federal Regulations ("CFR"). 20 C.F.R. § 416.924 (a),(d); Howard v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003)(applying 1997 Interim Final Rules for Determining Disability for a Child under Age 18).

If a plaintiff's impairment meets, or medically or functionally equals, a listed impairment, the plaintiff will be found disabled. 20

C.F.R. § 416.924(a). If not, or if the impairment does not meet the durational requirement, then the plaintiff will be found not disabled. Id.

The plaintiff's impairment will "medically equal" a listed impairment "if the medical findings are at least equal in severity and duration to the listed findings." 20 C.F.R. § 416.926 (a); Howard v. Barnhart, 341 F.3d at 1012.

For children, "functional equivalence" is evaluated using the following six domains of functioning: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating to others, 4) moving about and manipulating objects; 5) caring for yourself; and, 6) health and physical well-being. 20 C.F.R. § 416.926a (b) (1). The impairment will be considered "functionally equivalent" if the plaintiff has "marked" limitation in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a (a); Howard v. Barnhart, 341 F.3d at 1012.

**2. Issues**

**A. Lay witness testimony (Issue # 1)**

Plaintiff first contends the ALJ improperly failed to consider the testimony of Ms. Caldwell.

Particularly in a child's benefits case, "descriptions by friends and family members in a position to observe [plaintiff's] symptoms and daily activities have routinely been treated as competent evidence." Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987). Accordingly, competent lay testimony as to a plaintiff's symptoms "cannot be disregarded without comment." Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006)(citations omitted). Rather, "[i]f the

ALJ wishes to discount the testimony of the lay witness, he must give reasons that are germane to each witness for doing so." Id. (citations omitted).

Germane reasons may include, for example, that the witness's testimony is inconsistent with the medical evidence of record, Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005), or that the witness has made contradictory or inconsistent statements, e.g., Lewis v. Apfel, 236 F.3d 503, 512 (9th cir. 2001).

Here, though the ALJ found Z.W. suffered from severe impairments, he concluded that she was not impaired to the extent described by Ms. Caldwell. Essentially, the ALJ concluded that Ms. Caldwell's testimony was inconsistent with several of her reports to medical professionals and, moreover, that her statements were not wholly borne out by the medical evidence. Specifically, he found the following inconsistencies with respect to Ms. Caldwell's testimony:

- she testified Z.W. eats "constantly," (TR 341), though ALJ noted that no evidence Z.W. is overweight or has an eating disorder (see TR 196);
- she testified Z.W. continues to drink from the toilet, will eat a tube of toothpaste, will go to the bathroom on the floor, (TR 341-44), but the ALJ noted no evidence that Ms. Caldwell reported this type of behavior to the psychiatrist who had been treating Z.W. since 2007, (TR 275-285);
- she inconsistently describes Z.W. as a child who is out of control and acts, as above, egregiously, and, alternately, as a child who is academically slow but otherwise playful, talkative, and inquisitive (e.g., TR 174);

- she testified that Z.W.'s behavior (other than her sleep patterns) has not been ameliorated to any degree since she began taking medication, (TR 351), whereas she described improvement in Z.W.'s emotions to the prescribing psychiatrist, (TR 282).

(See TR 25.)

These reasons for rejecting Ms. Caldwell's testimony are both germane to Ms. Caldwell and they are supported by substantial evidence in the record.

Contrary to plaintiff's assertion, the ALJ is not required to articulate what particular weight, if any, he attributes to lay witness testimony so long as he has articulated germane reasons for discrediting that testimony. See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993) (lay witness testimony is competent evidence, but may be disregarded based on germane reasons). Cf., 20 C.F.R. 404.1527 (2006) (describing weight the Commissioner will give to statements of qualified medical sources). In any event, the ALJ did, in fact, specify the weight he attributed to Ms. Caldwell's testimony. He concluded that her statements concerning the intensity, persistence, and limiting effects of Z.W.'s symptoms were "not credible to the extent they are inconsistent with finding that [Z.W.] does not have an impairment or combination of impairments that functionally equals the listings . . . ." (TR 20.) There is no material legal error here.

**B. Treating physician's report (Issue # 2)**

Plaintiff next challenges the ALJ's characterization of the reports of psychiatrist Elliot Moon, M.D., who has treated Z.W. since approximately March 2007.

The Social Security Administration favors the opinion of a treating

physician over non-treating physicians. See 20 C.F.R. § 416.927. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," the ALJ is to give that opinion "controlling weight." 20 C.F.R. § 416.927(d)(2).

The ALJ followed that directive here. He discussed Dr. Moon's treatment records at length and explicitly and repeatedly relied upon them in arriving at his findings and conclusions. (See TR 24-27.) The ALJ discussed, for example, an April 17, 2008, report by Dr. Moon, in which Dr. Moon noted that he increased Z.W.'s daily dosage of Zoloft. Dr. Moon noted that this helped to improve Z.W.'s sad feelings and emotions, and her ability to resolve crying spells. He also noted that the increased dosage correlated with a decrease in threatening behavior by Z.W. (TR 282.) This report also indicated, as the ALJ related, that even after Z.W. was put on an increased dosage of Zoloft, she continued to engage in troubling behavior at school and was, accordingly, transferred to a classroom with a smaller student-to-teacher ratio. (TR 24, 282.) According to Dr. Moon's notes, and reflected in the ALJ's decision, Z.W. quickly became more compliant in school after the transfer. (Id.)

The ALJ's also pointed to Dr. Moon's "Psychotropic Medication Authorization Form" to the Los Angeles County Superior Court, dated April 18, 2008, in which he further reported that Z.W.'s prescriptions had a "positive impact on all target symptoms." (TR 24, 274.)

Plaintiff takes issue, however, with a statement by the ALJ which, she contends, misinterprets these reports. Specifically, in discussing the reasons for discounting Ms. Caldwell's statements to the effect that

plaintiff's "egregious" behavior continues unabated, the ALJ suggested a further reason to do so is that "there is evidence [Z.W.'s] deportment has improved on medication, and since she is now in a smaller education setting, she should receive much more individualized attention, which should help improve her behavior problems and her classroom performance." (TR 25.) The court observes that the ALJ made other statements to similar effect in later portions of the decision, as well. (See, e.g., TR 26 (a), (b), and (c).)

Plaintiff contends these statements by the ALJ improperly "substitute" his opinion for that of Dr. Moon on the basis that Dr. Moon's reports indicate Z.W. still suffered from some impairments even after her medication was increased.

The ALJ did not misread Dr. Moon's reports, however, and, in fact, accurately characterized them. The ALJ found there is evidence in the record showing Z.W.'s deportment improves when she is on medication. (TR 24-26.) Dr. Moon specifically said that this is the case. (E.g., TR 274.) Although plaintiff appears to suggest otherwise, the ALJ did not state Z.W.'s symptoms were wholly ameliorated by the medications she receives, nor is such a finding necessary to find plaintiff not to be disabled under the Act.

In any event, to the extent the ALJ was required draw an inference to conclude that Z.W. showed behavioral improvement when on medication, it was his province to do so, provided that the inferences he drew logically flowed from evidence of record. See Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The court finds that any inference drawn here did so. Indeed, clinical psychologist and medical expert Dr. Craig Rath testified that the record "overwhelmingly" shows plaintiff's

behavior improves when she is taking medication. (TR 338.) This testimony alone would serve as substantial evidence to support the ALJ's characterization. See Magallenes v. Bowen, 881 F.2d 747, 752 (9th Cir. 1989).

There is, accordingly, no material error here.

**C. Functional equivalence to listing 112.11 (Issue # 3)**

Last, plaintiff claims the ALJ committed material legal error in finding that Z.W.'s behavioral issues do not amount to the "functional equivalent" of listing 112.11, i.e., attention deficit hyperactivity disorder ("ADHD"). (See TR 19.)

To medically "equal" a listed impairment, a plaintiff must present medical findings at least equal in severity and duration to all of the criteria for the most similar listed impairment. See Sullivan v. Zebley, 493 U.S. 530, 531.

Standing alone, a diagnosis of ADHD does not establish a disability under the Act; statutory disability is established when the child suffers from the particular impairments specified within the listing at the required degree of severity.[3] See, e.g., Tackett v. Apfel, 180 F.3d

---

[3] The criteria for ADHD listing 112.11 are as follows. *Attention Deficit Hyperactivity Disorder*: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented findings of all three of the following:
   1. Marked inattention; and
   2. Marked impulsivity; and
   3. Marked hyperactivity; and,

B. . . . for children (age 3 to attainment age of 18), resulting in at least two of . . . :
   a. Marked impairment in age-appropriate cognitive/communicative function, documented by

1094, 1099 (9th Cir. 1999) (citation omitted).

While the ALJ concluded that Z.W. has the severe impairment of ADHD, he, permissibly, also found that her ADHD did not meet or equal the severity required by the listing, (TR 19), and plaintiff does not dispute this. The next step, then, when a child disability plaintiff does not have an impairment or combination of impairments that meets or equals any listing, is for the ALJ to consider whether the child's impairments "functionally equal" the listings. 20 C.F.R. § 416.926a(a).

For children, "functional equivalence" is determined not by reference to the criteria for any particular listed impairment, but by reviewing all relevant information in the case record, including information from a broad range of medical sources and non-medical sources, to assess the child's functioning in the six areas of

---

medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests of language and communication; or

b. Marked impairment in age appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

See 20 C.F.R. Pt. 404, Subpt. P, App. 1, 112.11.

functioning, "domains," set out above.  See 20 C.F.R. § 416.926a.  To "functionally equal" a listed impairment, the child's impairment or combination of impairments must result in "marked" limitations in only two domains, or an "extreme" limitation in one domain.  Id.  Broadly speaking, a "marked" limitation is one that is more than "mild" or "moderate."  20 C.F.R. § 416.926a (e) (2).

Based upon an extensive review and evaluation of the record evidence, the ALJ here concluded Z.W.'s impairments did not functionally equal a listing because she did not exhibit a "marked" degree of functional impairment in any of the six functional domains, as follows.

First, the ALJ found Z.W. has less than a marked limitation in acquiring and using information.  (TR 25-26.)  He noted that, while the record shows she has difficulty in school, Z.W. is young for her grade, (TR 256), her intelligence has been assessed at borderline to low-average, (e.g., TR 179), and she has a learning disability, (e.g., TR 253).  (See TR 26.)  To combat these and her behavioral difficulties at school, the ALJ noted, Z.W. has been placed in a small classroom, (TR 282), and he concluded that she should be able to receive adequate one-on-one instruction there.  (TR 26.)

Second, the ALJ found Z.W. has less than a marked limitation in her ability to attend to and complete tasks.  (TR 26.)  He noted that, while she had been described as fidgety and with poor attention, and receives treatment for ADHD, Dr. Moon reported her medication positively impacted "all" target symptoms for which he treats her.  (TR 26, 275.)

Third, the ALJ found Z.W. has less than a marked limitation in interacting with and relating to others.  (TR 26.)  Although the ALJ noted troubling behaviors when Z.W. was in a traditional classroom, she

rapidly improved when she was moved to the smaller class. (TR 26, 282.)

Fourth, the ALJ found Z.W. has no limitation in moving about and manipulating objects. (TR 26.) Although Ms. Caldwell reported, prior to the application date and when Z.W. was less than three years old, that Z.W. was "clumsy" and had balance problems, (TR 148), she has since noted that Z.W. is very active, (TR 193). Additionally, the ALJ observed that in the course of an internal medical examination, consultative physician Mustafa Ammar, M.D., observed Z.W. running and playing inside the clinic with no apparent difficulty. (TR 26, 194.)

Fifth, the ALJ found Z.W. has no limitation in the ability to care for herself. He noted that the evidence showed Z.W. had no problems performing age-appropriate personal grooming and hygiene. (TR 27.)

Finally, the ALJ found Z.W. has a less than marked limitation in her health and physical well-being. (TR 27.) Although Z.W. has flat feet, she moves around and plays in an age-appropriate manner. (TR 27, 194.) Although she was found to have asthma, and she apparently uses a nebulizer as-needed,(TR 268), the ALJ noted that were was no record of emergency room visits or hospitalization as a result, or, indeed, any evidence that Z.W. was being treated for asthma at the time of the hearing. (TR 27.)

In arriving at these findings, in addition to his review and citation of other evidence in the record, the ALJ cited and adopted the conclusions of both testifying medical experts, (TR 21, 324-26, 326-39), and two state agency reviewing physicians, (TR 25, 197-98, 210-15), all of whom concurred Z.W. does not suffer from a marked impairment in any domain of functioning, at least when she is being treated. Impairments that can be effectively controlled are not considered to be "disabling"

for the purpose of determining eligibility for SSI benefits. See 20 C.F.R. § 416.924a (b)(9); see also Warre v. Comm'r of Social Sec. Admin., 439 F.3d 1001, 1005 (9th Cir. 2006).

The court finds the ALJ's conclusion regarding functional equivalence is, therefore, supported by substantial evidence. See Magallanes v. Bowen, 881 F.2d 747, 752 (9th Cir. 1989) (holding that when, as here, the testimony of the medical experts is consistent with other medical evidence of record, it constitutes substantial evidence to support a finding of non-disability); 20 C.F.R. § 416.927 (f) (2) (providing that state agency medical consultants are "highly qualified physicians" who are also "experts in Social Security disability evaluation"); Social Security Ruling 96-6p (concluding that "[f]indings of fact made by State agency medical and psychological consultants . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources").

Plaintiff argues that a "longitudinal view" of the record establishes that Z.W. does, in fact, suffer from "marked" impairments in her functioning, though she does not specify in which functional domains she believes Z.W. is impaired to a marked degree. As support, plaintiff points to snippets of evidence ranging from 2005 to the present which indicate Z.W. has exhibited troubling behavior. The court observes that Z.W., who underwent a series of unfortunate upheavals in her first several years of life, (e.g., TR 137), certainly has historically employed a range of troubling behaviors. Plaintiff is now medicated, however, she was recently transferred to a smaller class, and her behavior has, according to Dr. Moon, been improving as a result. (TR 282.) Even if, moreover, as plaintiff suggests, "the medical evidence

presented perhaps would permit a reasonable mind to make a finding of disability . . . [i]t also would permit a finding of no disability." Key v. Heckler, 754 F.2d 1545, 1549 (9th Cir. 1985). And "[w]hen there is evidence sufficient to support either outcome," as plaintiff indicates is the case here, "[the court] must affirm the decision actually made." See id.

The conclusion of the ALJ is supported by substantial evidence and there is no material legal error here.

**CONCLUSION**

Z.W. clearly has severe impairments. The ALJ found, however, that she is not currently disabled as that has been defined by the Act. If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, this court may not substitute its judgment for that of the Commissioner. Flaten v. Sec'y of Health and Human Servs., 44 F.3d at 1457.

After careful consideration of the record as a whole, the magistrate judge concludes that the Commissioner's decision is supported by substantial evidence and is free from material legal error. Accordingly, it is ordered that judgment be entered in favor of the Commissioner.

DATED: Aug 25, 2009

Carolyn Turchin

CAROLYN TURCHIN
UNITED STATES MAGISTRATE JUDGE

**SOCIAL SECURITY ADMINISTRATION**
**Office of Disability Adjudication and Review**

**DECISION**

| **IN THE CASE OF** | **CLAIM FOR** |
|---|---|
| [redacted] | Supplemental Security Income |
| (Claimant) | [redacted] |
| (Wage Earner) | (Social Security Number) |

## JURISDICTION AND PROCEDURAL HISTORY

This case is before me on remand from the Appeals Council. In its remand order, the Appeals Council directed the undersigned to give the claimant another opportunity for a hearing.

The claimant appeared and testified at a hearing held on April 16, 2008, in San Bernardino, CA. She was accompanied by her aunt, Chevell Caldwell, who testified on behalf of the claimant. Colin Hubbard, M.D., an impartial medical expert in pediatrics medicine, also testified at the hearing. The claimant's representative was not present, so a supplemental hearing was scheduled and held on June 10, 2008. The claimant and Ms. Caldwell appeared at this hearing. Dr. Hubbard and Craig C. Rath, Ph.D., an impartial medical expert in psychology, appeared personally and testified. The claimant is represented by Michael J. Hurley, an attorney.

The claimant is alleging disability since December 1, 2003.

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(C) of the Social Security Act. An individual under the age of 18 shall be considered disabled if she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. Notwithstanding the above, no individual under the age of 18 who engages in substantial gainful activity may be considered to be disabled.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), I have considered the complete medical history consistent with 20 CFR 416.912(d).

After reviewing all of the evidence, I conclude the claimant has not been disabled within the meaning of the Social Security Act since February 25, 2005, the date the application was filed.

See Next Page

EXHIBIT





## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a three-step sequential evaluation process to determine whether an individual under the age of 18 is disabled (20 CFR 416.924(a)).

At step one, I must determine whether the claimant is engaging in substantial gainful activity. Substantial gainful activity is defined as work activity that is both substantial and gainful. An individual is engaging in substantial gainful activity if she is doing significant physical or mental activities for pay or profit (20 CFR 416.972). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in substantial gainful activity (20 CFR 416.974 and 416.975). If the claimant is performing substantial gainful work, she is not disabled regardless of her medical condition(s) (20 CFR 416.924(b)). If the claimant is not engaging in substantial gainful activity, the analysis proceeds to the second step.

At step two, I must determine whether the claimant has a medically determinable "severe" impairment or a combination of impairments that is "severe." For an individual who has not attained age 18, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. If the claimant does not have a medically determinable severe impairment(s), she is not disabled (20 CFR 416.924(c)). If the claimant has a severe impairment(s), the analysis proceeds to the third step.

At step three, I must determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listing, or that functionally equals the listings. In making this determination, I must consider the combined effect of all medically determinable impairments, even those that are not severe (20 CFR 416.923, 416.924a(b)(4), and 416.926a(a) and (c)). If the claimant has an impairment or combination of impairments that meets, medically equals or functionally equals the listings, and it has lasted or is expected to last for a continuous period of at least 12 months, she is presumed to be disabled. If not, the claimant is not disabled (20 CFR 416.924(d)).

In determining whether an impairment or combination of impairments functionally equals the listings, I must assess the claimant's functioning in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. In making this assessment, I must compare how appropriately, effectively and independently the claimant performs activities compared to the performance of other children of the same age who do not have impairments. To functionally equal the listings, the claimant's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain (20 CFR 416.926a(d)).

In assessing whether the claimant has "marked" or "extreme" limitations, I must consider the functional limitations from all medically determinable impairments, including any impairments that are not severe (20 CFR 416.926a(a)). I must consider the interactive and cumulative effects

See Next Page



of the claimant's impairment or multiple impairments in any affected domain (20 CFR 416.926a(c)).

Social Security regulation 20 CFR 416.926a(e)(2) explains that a child has a "marked limitation" in a domain when her impairment(s) "interferes seriously" with the ability to independently initiate, sustain, or complete activities. A child's day-to-day functioning may be seriously limited when the impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. The regulations also explain that a "marked" limitation also means:

1. A limitation that is "more than moderate" but "less than extreme."

2. The equivalent of functioning that would be expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

3. A valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and her day-to-day functioning in domain-related activities is consistent with that score.

4. For the domain of health and physical well-being, frequent episodes of illnesses because of the impairment(s) or frequent exacerbations of the impairment(s) that results in significant, documented symptoms or signs that occur: (a) on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more; (b) more often than 3 times in a year or once every 4 months, but not lasting for 2 weeks; or (c) less often than an average of 3 times a year or once every 4 months but lasting longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

Social Security regulation 20 CFR 416.926a(e)(3) explains that a child has an "extreme" limitation in a domain when her impairment(s) interferes "very seriously" with her ability to independently initiate, sustain, or complete activities. A child's day-to-day functioning may be very seriously limited when her impairment(s) limits only one activity or when the interactive and cumulative effects of her impairments(s) limit several activities. The regulations also explain that an "extreme" limitation also means:

1. A limitation that is "more than marked."

2. The equivalent of functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean.

3. A valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and her day-to-day functioning in domain-related activities is consistent with that score.

See Next Page

4.  For the domain of health and physical well-being, episodes of illness or exacerbations that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a "marked" limitation.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, I make the following findings:

**1.   The claimant was born on August 8, 2001. Therefore, she was a preschool-age child on February 25, 2005, the date the application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).**

**2.   The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.924(b) and 416.972).**

**3.   The claimant has the following severe impairments: attention deficit hyperactivity disorder, learning disability, asthma, and flat feet (20 CFR 416.924(c)).**

The claimant's impairments affect her more than minimally; thus, they are considered to be severe.

**4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).**

The claimant's impairments do not medically meet or equal Listings 112.11, 112.05, 103.03, or any of the 1.00 (musculoskeletal system).

**5.   The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).**

In determining the degree of limitation in each of the six functional domains, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929, SSRs 96-4p and 96-7p. I have also considered the opinion evidence in accordance with 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which

See Next Page

they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record.

Ms. Caldwell testified she is the claimant's maternal aunt, and she is attempting to adopt the child. She has received the papers from her attorney, and they are attempting to schedule a court date for the adoption process. The child has lived with her aunt since the age of one. She was in foster care for a period of time, but has lived with her aunt off and on for five years. The mother's rights have been terminated since 2004. Cristy York is the claimant's psychoanalyst. The child also sees a psychiatrist Dr. Moon at the McKinley Center in San Dimas. Dr. Moon gives the claimant her medications, which are approved by the court before they are administered. The child attends special education classes and has had to be restrained a couple of times.

At the supplemental hearing, Ms. Caldwell testified the claimant has improved with her medication, but her behavior is the same, and she has to be restrained at times at school. The doctor said he would prescribe her a new medication at the next visit. Ms. Caldwell testified a sneeze can change the child's behavior. She is constantly moving, writing on the walls, and drinking out of the toilet. She sleeps only 2 hours at night. She goes to sleep at 1:30 A.M. until 3:00 A.M. She cannot sit still; in stores, she throws fits. She has racing thoughts, she is very impulsive, and she will eat a whole tube of tooth paste. She will eat in the middle of the night. She cannot eat dairy products, but she will attempt to do so at night time. She does not play with other children and goes off by herself. She tries to hit other children with her shoes. One minute she is happy, and the next minute, she throws her body around, and she will throw toys, shoes, or whatever she gets her hands on. Dr. Moon wants to prescribe a different medication, but the court will not let him. The child has bitten her teachers. She is not focused on education because she is too busy fighting with the other kids. She can read a few words but just the sight words. She is behind in school. She takes off her clothes and goes to the bathroom on the floor. Ms. Caldwell has to help the child dress and clean herself. She has been on medication and in therapy for over a year.

After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below.

Dr. Hubbard testified that the claimant's physical impairments are asthma and flat feet. The claimant's impairments do meet or equal a listed impairment, and the claimant's condition does not functional equal any impairment. The claimant's physical impairments do not cause any limitations in the domains of acquiring and using information, attending and completing tasks, interaction and relating with others, moving about and manipulating objects, or caring for herself. The claimant's physical impairments cause less than marked limitations in health and physical well-being. Dr. Hubbard also submitted a written opinion (Exhibit 9F), which supports

See Next Page

his testimony. I concur and adopt the testimony of Dr. Hubbard, who opinion is consistent with the evidence as a while.

Dr. Rath testified the claimant has severe mental impairments consisting of attention deficit hyperactivity disorder and a learning disability, which do not medically or functionally meet or equal a listed impairment. The claimant's mental impairments cause less than marked limitations in acquiring and using information, attending and completing tasks, and in interacting and relating with others, and no impairment in caring for herself or health and physical well being. Dr. Rath clarified that the claimant's limitations are less than marked in attending and completing tasks when she is medicated. He testified that the claimant's condition has improved with medication, and he cited the current report of the claimant's psychiatrist (Exhibit 18F), which noted the "positive impact" of the claimant's current medication regiment. I agree and rely heavily on Dr. Rath's testimony, which is supported by the totality of the evidence.

There are no treatment records in the file showing that the claimant is receiving treatment for any physical impairment. Consequently, the State Agency arranged for the claimant to undergo a consultative internal medicine examination in order to assess the severity of the claimant's physical impairments. On December 18, 2005, Dr. Mustafa Ammar conducted the examination of the claimant (Exhibit 8F). The child's aunt, who had accompanied the claimant, reported that the claimant had a history of asthma/allergies and an ankle problem (Exhibit 8F, p. 1). During the examination, the claimant ran and played inside the clinic with no apparent difficulty. Dr. Ammar said the claimant's height and weight were near normal at 40" and 32 pounds. Lung and heart sounds were normal (Exhibit 8F, p. 2). The claimant had flat feet; otherwise, the remainder of the examination was normal (Exhibit 8F, p. 3). Dr. Ammar reported he did not observe any significant problem in the claimant's development. The claimant had normal speech and communication skills, and he did not observe any emotional problem displayed by the claimant (Exhibit 8F, p. 4).

There are indications that in 2004, school authorities thought the claimant might have a seizure disorder (Exhibit 2F, pp. 1, 14); however, there is no evidence the claimant has ever been treated for seizures or pseudo-seizure activity.

There is a Teacher's Questionnaire completed by Brenda Sorenson and dated December 14, 2005 (Exhibit 4E). Ms. Sorenson identified herself as the claimant's preschool teacher (Exhibit 4E, p. 1). In the domain of acquiring and using information, Ms. Sorenson indicated the claimant had obvious problems in understanding school and content vocabulary, providing organized oral explanation and adequate descriptions, and applying problem solving skills in class discussions. Otherwise, the claimant had only slight problems in other areas, or the areas were not applicable at the time, such as reading and comprehension and doing math problems (Exhibit 4E, p. 2). Ms. Sorenson did not provide any written statements in support of the above. In the domain of attending and completing tasks, Ms. Sorenson indicated the claimant had a serious problem sustaining attention during play and sports activities, and obvious problems paying attention, refocusing to tasks, carrying out multi-step instructions, and waiting to take her turn. She reported the claimant's behavior was not disruptive, but when the claimant reached kindergarten, her conduct could cause more problems (Exhibit 4E, p. 3). In the domain of interacting and relating with others, Ms. Sorenson indicated the claimant had serious problems in expressing

See Next Page

anger appropriately and using adequate vocabulary and grammar to communicate. She indicated the claimant had obvious problems playing cooperatively with other children, making and keeping friends, seeking attention appropriately, resting and obeying adults in charge, relating experiences and telling stories, and interpreting facial expressions, body language, and hints. Ms. Sorenson indicated that the claimant was receiving speech and language services, and a modification to her daily schedule had been made to accommodate the claimant (Exhibit 4E, p. 4). Ms. Sorenson reported that the claimant had no problems in moving about and manipulating objects (Exhibit 4E, p. 5). In the domain of caring for herself, Ms. Sorenson indicated the claimant had obvious problems in the following areas: handling frustrating, being patient, identifying and appropriately asserting emotional needs, responding appropriately to changes in her mood, and using appropriate coping skills to meet the daily demands of school environment. In all other areas, Ms. Sorenson indicated the claimant had no problems, slight problems, or the category was not applicable (Exhibit 4E, p. 6). In the domain of health and physical well being, Ms. Sorenson indicated the claimant was not on medication, and she did not frequently miss school because of illness (Exhibit 4E, p. 7).

On June 30, 2004, a licensed clinic social worker evaluated the claimant for child services in the State of Nevada. The social worker noted the claimant had been placed in three foster homes within a period of five months. The claimant had been separated from her siblings, was sleeping poorly, and never smiled. The claimant's aunt had assumed care for the claimant, and the family had a number of group sessions. The claimant improved her behavior; she was staying in bed at night; she was smiling; and she was able to express delight and excitement. The diagnoses were victim of neglect, sibling relationship problems, and post traumatic stress disorder. The intake GAF assessment was 55;[1] at the time of discharge it was 65[2] (Exhibit 1F, pp. 2-11).

Records from Washoe County School District show that the claimant was placed in special education classes for school readiness, gross or fine motor function, and because of a speech and language impairment, (Exhibit 2F, 3F, 4F).

A psychological consultative evaluation was conducted on June 1, 2005 by Melanie Drakulic, a licensed educational psychologist, for purposes of evaluating the claimant intellectual and adaptive functioning (Exhibit 5F). The claimant's Full Scale I.Q. and general language scores were in the low average range; her adaptive functioning was assessed in the extreme low range (Exhibit 5F, pp. 2-4).

The claimant's speech impairment has not significantly impacted the claimant, and her speech has improved. On June 15, 2005, Amy Lee, a speech pathologist, conducted a speech and language consultative examination of the claimant (Exhibit 6F). Ms. Lee reported the claimant's attention span was adequate during the testing procedure. Although the claimant was mildly

---

[1] According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (4th ed., 1994), a GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

[2] Per the DSM-IV, a GAF score between 61-70 indicates some mild symptoms, such as depressed mood and mild insomnia, or some difficulty in social occupational, or school function, such as occasional truancy or theft within the household, but generally functioning pretty well, and has some meaningful interpersonal relationships.

See Next Page

impaired in speech articulation, and language skills, her speech and vocal quality were normal, and she did not have a fluency problems. Overall, the claimant's speech was 85% intelligible (Exhibit 6F, p. 3).

Records from Etiwanda School District show that the claimant is receiving special services and has a behavior plan (Exhibit 14F, p. 3). According to the initial evaluation on April 24, 2007. the claimant is a visual learner and learns best one on one. She verbally communicates "non-stop;" she does not have clear printing skills; and she frequently cries or "shuts down" when she does not want to do something (Exhibit 14F, p. 5). Psycho-diagnostic testing revealed that the claimant was low in academic areas (Exhibit 14F, pp. 16, 25); however, she was in the low average to average range in cognitive ability. There were also concerns about the claimant's constant desire to eat (Exhibit 14F, p. 27). On February 15, 2008, school officials met and agreed that the claimant's needs would be better served in a more restrictive placement, so the claimant was moved to a "school for children with emotional disturbance" (Exhibit 15F, p. 2). However, there are no records or notes in the file indicating why the school officials came to that conclusion other than a short note indicating that the claimant had difficulty meeting grade level goals due to her "severe behavioral issues" (Exhibit 15F, p. 1). There are no disciplinary notes or reports attached which showed behavioral problems during the school years 2007 to 2008.

On August 9, 2005, Joanna T. Koulianos, a clinical psychologist, conducted a psychological consultative examination of the claimant, who was then four years of age (Exhibit 7F). The claimant's aunt reported that the claimant was impulsive and easily distracted, and the claimant had low comprehension. She said the claimant's mother abused crystal methamphetamine and alcohol during the pregnancy She reported the claimant had problems with aggressiveness towards adults and learning how to interact with her peers (Exhibit 7F, pp. 1-2). During the mental status examination, the claimant's speech was clear, and she displayed no language difficulties. No excessive motor activity or impulsive behavior was noted. The claimant appeared alert and curious. She was easily distracted and required redirection. Her affect was cheerful (Exhibit 7F, p. 4). The claimant's Verbal I.Q. was 73; her Performance I.Q. was 84, and her Full Scale I.Q. was 76 (Exhibit 7F, p. 7). Dr. Koulianos diagnosed attention deficit hyperactivity disorder, combined type, provisional, adjustment disorder with disturbance of conduct versus disruptive behavioral disorder, not otherwise specified (NOS), and underlying borderline intellectual functioning. Dr. Koulianos concluded that the claimant's intellectual functioning was mildly to moderately impaired; and that the claimant was impaired in her ability to social integrate with peers and adults and in her ability to pay attention and concentrate. Dr. Koulianos further opined that the claimant's had a history of behavior and symptoms consistent with a behavioral disorder, per the aunt's report. Dr. Koulianos also observed that although the claimant's fine and gross motor abilities appeared normal, the aunt had reported that the claimant had problems in gross motor and balance functions (Exhibit 7F, pp. 5-6).

On February 14, 2007, Dr. Michael Knapp, a clinical psychologist, conducted a consultative psychological examination of the claimant for the state foster care program (Exhibit 17F). During the examination, Dr. Knapp reported the claimant's verbal presentation was "very odd," because she would begin one subject and then talk about another, and her responses did not make sense. The claimant displayed difficulty sitting through the interview, and she had difficulty maintaining her attention and concentration. She talked non-stopped in a monotone voice, and

See Next Page

Dr. Knapp reported the claimant's speech was difficult to understand. Intellectual and memory functioning were average to below average. Her fund of general knowledge was low average; and she appeared to have difficulty with thought processing. She had no formal thought content difficulty. Dr. Knapp diagnosed attention deficit hyperactivity disorder and oppositional defiant disorder. He assessed a GAF of 48[3] and concluded that the claimant qualified for foster placement at the D rate, which apparently made her eligible for extra state services (Exhibit 17F, pp. 5-6).

I do not attach significant weight to Dr. Knapp's opinion because it is unsupported by the weight of the evidence. The claimant has a speech impairment, but Ms. Lee, a speech pathologist, tested the claimant and found that the claimant's speech was 85% understandable. There are indicators in the file that the claimant has attention deficit hyperactivity disorder and she is restless at times, but Dr. Moon's examinations of the claimant have been generally benign, as discussed below. Therefore, I do not attach much weight to Dr. Knapp's opinion.

There is an initial consultative psychiatric examination by Dr. Eliot Moon in the file (Exhibit 19F). The report is misdated; however, it was conducted sometime during 2007 since the claimant was age 5 at the time of the examination, and Dr. Moon reported the claimant was examined by another psychiatrist in January 2007 (Exhibit 19F, p. 2). During the examination, the claimant was cooperative but restless. She showed no evidence of responding to internal stimuli. She was oriented. Memory, speech, mood and affect, associations, and thought content were normal. Dr. Moon thought the claimant displayed poor insight and judgment as well as impulse control (Exhibit 19F, p. 2). He diagnosed a dysthymic disorder and attention deficit hyperactivity disorder, began the claimant on medications, and recommended individual therapy (Exhibit 19F, p. 3).

Treatment notes reflect that on February 21, 2008, the aunt reported that although the claimant initially improved after being Zoloft, she had increased mood and behavior struggles and would burst out crying for no reason. During the mental status examination, the claimant was alert, cooperative and displayed no abnormal motor movements. She appears slightly anxious and concerned. Dr. Moon increased the amount of Zoloft (Exhibit 20F, pp. 6-7). On April 17, 2008, the claimant's aunt reported improvement with the increased Zoloft. However, she said the claimant displayed disruptive behavior in the classroom which caused her to be removed to a smaller classroom. The claimant's aunt further reported that the claimant was restrained on two occasions in the smaller classroom, but now understood her tantrums and aggressive behavior would not be tolerated and was more compliant. The mental status examination was benign and showed no abnormalities (Exhibit 20F, p. 4).

In a "Psychotropic Medication Authorization Form" to the Los Angeles County Superior Court on April 18, 2008, Dr. Moon reported that the claimant's current medication regimen has had a "positive impact" on all of the claimant's symptoms (Exhibit 18F, pp. 1-2).

---

[3] According to the Diagnostic and Statistical Manual of Mental Disorders, (DSM-IV) 4th ed., 1994) a GAF of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

See Next Page

Apart from objective findings, there are substantial reasons pursuant to Social Security Ruling 96-7p to conclude that the claimant remains able to engage in a wide range of activities without significant difficulty. Ms. Caldwell's testimony described a child who is out of control and has egregious behavior. Yet, on other occasions, Ms. Caldwell has reported the claimant is playful, talkative, and inquisitive. She is a child who loves to color, paint, and watch cartoons (Exhibit 4F, p. 1). Ms. Caldwell testified the child drinks from the toilet; she constantly eats and will eat a tube of toothpaste; she goes to the bathroom on the floor; and she only sleeps two hours a night. However, there is no evidence the aunt has reported this type of alarming behavior to Dr. Moon, the claimant's psychiatrist. She reported the claimant constantly eats; but there is no evidence the claimant is overweight or that she has an eating disorder. There is evidence the claimant's deportment has improved on medication, and since she is now in a smaller education setting, she should received much more individualized attention, which should help improve her behavior problems and her classroom performance. All of the aforementioned factors are inconsistent with the presence of an incapacitating or debilitating medical condition.

As for the opinion evidence, one State Agency review physician at the initial level determined that the claimant's physical and mental impairments did not medically or functionally meet or equal any listed impairment, and that the claimant had less than marked impairments in the following domains: moving about and manipulating objects, acquiring and using information, attending and completing tasks, and interacting and relating with others; and no impairment in the domains of caring for oneself and health and physical well being (Exhibits 9F). At the reconsideration level, the second review physician also concluded that the claimant did not meet or equal any listed impairment, but that the claimant had less than marked impairments in acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well being; and no impairment in moving about and manipulating objects and caring for herself (Exhibit 11F, pp. 3-4).

I have also considered the GAF scores assessed by various individuals, but these assessments are not entitled to significant weight. Some of these assessments were made by mental health clinicians and social workers who are not considered to be acceptable medical sources. Moreover, although the DSM-IV gives some descriptions that can be followed in defining a GAF score, there is really no evidence to indicate the reliability of cross raters where one can conclude a particular GAF score means a particular limitation in work ability. Although it indicates some limitations in her functioning, it does not speak directly to her work capacity. Therefore, those assessments were not dispositive on the ultimate issue of disability.

In terms of the six domains of function, I find the following regarding limitations caused by the claimant's impairments:

**a. Acquiring and Using Information**

This domain considers how well a child is able to acquire or learn information, and how well a child uses the information she has learned (20 CFR 416.926a(g)).

The claimant has less than marked limitation in acquiring and using information. The record shows that the claimant has had difficulty in school. However, the school officials also noted the

See Next Page



claimant was young for her grade (Exhibit 14F, p. 25). The claimant's intelligence has been assessed at borderline to low average, and she has a learning disability. She receives special education services, and she has recently been placed in a much smaller classroom, so she should receive adequate one on one instruction to address her needs.

**b. Attending and Completing Tasks**

This domain considers how well a child is able to focus and maintain attention, and how well she is able to begin, carry through, and finish activities, including the pace at which she performs activities and the ease of changing activities (20 CFR 416.926a(h)).

The claimant has less than marked limitation in attending and completing tasks. The claimant has been described as fidgety and with poor attention and concentration skills. However, she is currently receiving treatment for attention deficit hyperactivity disorder, and Dr. Moon, the claimant's psychiatrist, has reported the prescriptive medication has positively impacted the claimant's symptoms (Exhibit 18F, p. 2).

**c. Interacting and Relating with Others**

This domain considers how well a child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others (20 CFR 416.926a(i)).

The claimant has less than marked limitation in interacting and relating with others. The claimant's aunt reported that the claimant bit her teacher on the stomach, refusing to do her school work, and not following instructions. She was also reported restrained on two occasions, but she now recognizes her poor behavior will not be tolerated, and she has been more compliant with school rules (Exhibit 20F, p. 2).

**d. Moving About and Manipulating Objects**

This domain considers how well a child is able to move her body from one place to another and how a child moves and manipulates objects. These are called gross and fine motor skills (20 CFR 416.926a(j)).

The claimant has no limitation in moving about and manipulating objects. The claimant's aunt reported that the claimant had problems with balance, and manipulating objects. Prior to the application date, the claimant's was described as "clumsy," and she had balance problems (Exhibit 2F, p. 1), but these have disappeared with time. The claimant's aunt reported the claimant was very active during the day. She plays and watches television (Exhibit 8F). During the internal medicine consultative examination, Dr. Ammar observed the claimant to run and play inside the clinic with no apparent difficulty. Although the claimant's aunt reported the claimant overeats, her height and weight were near normal at 40" and 32 pounds at the time of the examination (Exhibit 8F, p. 20).

See Next Page

e. **Caring for Yourself**

This domain considers how well a child maintains a healthy emotional and physical state, including how well a child satisfies her physical and emotional wants and needs in appropriate ways. This includes how the child copes with stress and changes in the environment and whether the child takes care of her own health, possessions, and living area (20 CFR 416.926a(k)).

<u>The claimant has no limitation in the ability to care for herself.</u> There is no evidence the claimant has problems performing age-appropriate personal grooming and hygiene.

f. **Health and Physical Well-Being**

This domain considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects (20 CFR 416.929a(l)).

Social Security regulation 20 CFR 416.926a(l)(3) sets forth some examples of limited functioning in this domain that children of any age might have; however, the examples do not necessarily describe marked or extreme limitation in the domain. Some examples of difficulty children could have involving their health and physical well-being are: (i) generalized symptoms, such as weakness, dizziness, agitation (e.g., excitability), lethargy (e.g., fatigue or loss of energy or stamina), or psychomotor retardation because of any impairment(s); (ii) somatic complaints related to an impairment (e.g., seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches or insomnia); (iii) limitations in physical functioning because of treatment (e.g., chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments); (iv) exacerbations from an impairment(s) that interfere with physical functioning; or (v) medical fragility requiring intensive medical care to maintain level of health and physical well-being.

<u>The claimant has less than marked limitation in health and physical well-being.</u> The claimant has flat feet, but she moves about and plays in an age appropriate manner. She reportedly has asthma and uses a nebulizer on an as needed basis (Exhibit 17F, p. 4). There is no documentation of emergency room visits or hospitalizations for acute asthma exacerbation; in fact, there is no evidence the claimant is currently being treated for this disorder.

Accordingly, the claimant does not have an impairment or combination of impairments that results in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning.

**6. The claimant has not been disabled, as defined in the Social Security Act, since February 25, 2005, the date the application was filed (20 CFR 416.924(a)).**

See Next Page

**DECISION**

Based on the application for supplemental security income protectively filed on February 25, 2005, the claimant is not disabled under Section 1614(a)(3)(C) of the Social Security Act.

By F.K. Verni ALJ

Lowell Fortune
Administrative Law Judge

Date
JUL 16 2008

KF